

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2007 DEC -6  PM 1: 12

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DUCOTE JAX HOLDINGS, L.L.C.,** | * | CIVIL ACTION NO. |
| | * | |
| **Plaintiffs,** | * | SECTION " "  **07 - 9353** |
| | * | |
| **VERSUS** | * | |
| | * | |
| **JDC GROUP, INC., GLF LTD. and** | * | MAGISTRATE DIVISION ( ) |
| **JOHN A. MANELLA,** | * | |
| | * | **SECT. R  MAG. 4** |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Ducote Jax Holdings

L.L.C., Poydras Partners, David L. Ducote, Trustee and Steven O. Medo, Jr., Trustee, who

respectfully file this Complaint, as follows:

### I.

### PARTIES

1.    Plaintiff DUCOTE JAX HOLDINGS, L.L.C. is a corporation organized under the

laws of the State of Louisiana, with its principal place of business in Orleans Parish.

Fee_____350._____
___ Process_____
X  Dktd_____
___ CtRmDep._____
___ Doc. No._____

2.      Plaintiff POYDRAS PARTNERS is a partnership formed under the laws of the State of Louisiana, with its principal place of business located in this District.

3.      Plaintiff DAVID L. DUCOTE, TRUSTEE, is a resident of the Parish of Orleans, State of Louisiana, and brings this suit on behalf of the Ducote Class Trust, a trust formed under the laws of the State of Louisiana.

4.      Plaintiff STEVEN O. MEDO, JR., TRUSTEE, is a resident of the Parish of Orleans, State of Louisiana, and brings this suit on behalf of The Chapman Charles Ducote Trust and The Suzette A. Ducote Trust, two trusts formed under the laws of the State of Louisiana.

5.      Defendant JDC GROUP, INC., at all material times was a domestic corporation organized and existing under the laws of the United States of America, with its principal place of business located in Lake Forest, Illinois.

6.      Defendant GLF LTD. is the successor to Defendant JDC GROUP, INC., is a corporation organized and existing under the laws of the United States of America, with its principal place of business located in Lake Forest, Illinois

7.      Upon information and belief, Defendant JOHN A. MANELLA, at all material times was the President of Defendants JDC GROUP, INC. and GLF LTD, is a natural person of the full age of majority, a citizen of the State of Illinois and a resident of the city of Chicago, Cook County.

## II.

## JURISDICTION AND VENUE

8.      This Honorable Court has jurisdiction over this civil action pursuant to 18 U.S.C. §§1964(a) and 1964(c), and 28 U.S.C. §§1331 and 1337.  This is a civil action arising under 18 U.S.C. §§1961-1968, §901(a) of Title IX of the Organized Crime Control Act of 1970, as amended,

otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in particular, under 18 U.S.C. §1964 and other causes of action as set forth hereafter. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

9.      Venue lies in this district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391. Defendants were written a check in this district by an unnamed co-conspirator who at relevant times conducted substantial business in this district. The violations occurred in this district. Defendants transact or have transacted their affairs in this district, and their concerted conduct upon which this action is founded, was directed at and intended to injure Plaintiffs in this district.

10.     Defendants, either on their own or through their agents and co-conspirators, at the time of the commission of the acts alleged hereunder, were found in, and/or transacted business in the State of Louisiana, and the cause of action which is the object of this Complaint arises out of business transactions in the State of Louisiana, including specific acts within this district as set forth herein.

11.     Defendants, either on their own or through their agents and co-conspirators, conspired to commit within the State of Louisiana the wrongful acts alleged in this Complaint and/or committed or participated in the commission of those acts within or without the State of Louisiana, purposefully directing their wrongful acts toward the forum of Louisiana, causing in Louisiana, in this district, directly or indirectly, the violations of RICO and the other causes of action set forth herein and Plaintiffs' resultant injuries.

12.     Defendants' racketeering activities were conducted through a pattern of acts and transactions which occurred and/or had their effect within the State of Louisiana, in this district.

13.     In connection with the acts and conduct described herein, the Defendants directly or indirectly used the means of interstate commerce, including the mails and telephones.

### III.

### BACKGROUND FACTS

**A.     INTRODUCTION**

14.     Plaintiffs bring this action against a Chicago corporation and its President for their roles in participating in the solicitation and inducement of Plaintiffs to participate in a tax strategy that the federal government has found to be an unregistered tax shelter and to file tax returns premised on the assumption that the strategy was lawful even though the Defendants knew or should have known it would not be.

15.     Plaintiffs allege claims under RICO, as well as under state-law for declaratory judgment and unjust enrichment, breach of fiduciary duty, fraud, negligent representation, breach of contract and civil conspiracy.  Plaintiffs seek disgorgement of the unethical, excessive, and illegal and fraudulent fees paid to the Defendants, jointly and in solido with other co-conspirators, plus compensation for all other damages sustained, including without limitation all fees and costs it has or will incur responding to the federal and state tax agencies as a result of the Defendants' actions, and any additional amounts, such as taxes, interest, and penalties, that have been and may be assessed against it by federal and state tax agencies, all of which damages must be trebled under RICO.  Plaintiffs also seek all attorneys' fees and costs incurred in this matter under RICO.

16.     Plaintiffs seek a judgment against each defendant jointly and in solido with all unnamed co-conspirators for all damages sustained.

4

17.     The Defendants, along with certain unnamed co-conspirators (the "Enterprise," as further defined below, individually "Members of the Enterprise" or "Members") entered into various arrangements amongst themselves to market and promote certain tax strategies to high net-worth individuals and business entities in order to generate fees that have been reported to exceed $250 million.  The Enterprise arranged to solicit high net-worth participants, like Plaintiffs, who were induced with misrepresentations to engage in this tax strategy and other transactions and pay the Enterprise exorbitant fees for advice that the Defendants and other Members of the Enterprise knew or should have known was improper and illegal.

18.     Among other things, the unnamed co-conspirators and Defendants making up the Enterprise colluded to induce Plaintiffs and others to engage in these tax strategies by unequivocally representing that the tax strategies had been vetted by major law firms and were lawful, by representing that these same law firms would provide legal opinions that attested to that characterization, and by assuring Plaintiffs that the tax strategies provided protection against penalties that the tax authorities could assess in the unlikely event that they challenged the tax strategies' legitimacy.

19.     The advice provided by the Enterprise has proven disastrous for Plaintiffs, in that they have paid a significant amount of fees to the unnamed co-conspirators and through them, Defendants, only to receive erroneous and incompetent advice that (a) has caused Plaintiffs, and their owners, to have to pay substantial additional taxes, plus interest and penalties, (b) has prevented Plaintiffs from availing themselves of legitimate tax opportunities and deductions, and (c) has caused Plaintiffs to pay substantial amounts to rectify the misconduct of the Enterprise.

5

20.     As described in more detail below, the unnamed co-conspirators abused their position

of trust in order to generate exorbitant fees for themselves and their associates, including Defendants,

by marketing a scheme to reduce their clients' income taxes that co-conspirators' represented as

being new and unique and, as such, not substantially similar to transactions that had been deemed

abusive by the Internal Revenue Service ("IRS").  To the contrary, the Members of the Enterprise

knew that the tax strategy they were marketing and promoting was similar to prior strategies found

abusive by the IRS and that, as a result, it would be intensely scrutinized and likely regarded as a

sham by the tax authorities.

21.     Further, the unnamed co-conspirators failed to disclose to Plaintiffs that they had

successfully solicited hundreds, perhaps over a thousand, other individuals and business entities to

participate in this tax scheme; instead, these unnamed co-conspirators deliberately misled Plaintiffs

into believing that the number of other participants was extremely limited.  Although the unnamed

co-conspirators knew or should have known that the tax scheme they promoted would likely be

deemed illegal and/or abusive, the sheer volume of transactions for which no economic loss was

sustained that were sold by the Members of the Enterprise foreclosed any possibility that the tax

authorities would find in favor of their clients, Plaintiffs included.

22.     Finally, the fraud described in this Complaint is strictly based on the unlawful

misrepresentations utilized by the Enterprise to solicit Plaintiffs into paying outrageous fees in

exchange for arranging an unlawful and/or abusive tax strategy created, marketed and promoted by

Defendants and their associates, and on the fact that Plaintiffs were never made aware of Defendants'

role or even Defendants' existence, much less Defendants receipt of at least $184,000.00 paid by

Plaintiffs to the Enterprise .  The fraud is not based on the purchase or sale of securities.

6

23.     Defendants named herein received from the unnamed co-conspirators  at least

$184,000.00 of the outrageous fees paid by Plaintiffs, without the knowledge of the Plaintiffs, and

to the Plaintiffs' detriment.

24.     If not for Defendants' role in the acts complained of in this Complaint, Plaintiffs

would not have had to pay such an outrageous fee to the Enterprise.

A.     THE TAX STRATEGY

25.     In brief, the Enterprise designed a tax strategy wherein a taxpayer would purchase and

write options and transfer those option positions to a partnership associated with the taxpayer. As

a result, the taxpayer claimed that the basis of the taxpayer's partnership interest was increased by

the cost of the purchased options, but was not reduced by the taxpayer's obligation with regard to

the options written. European-style digital options were used in this transaction because they can be

obtained at relatively modest cost and at minimum risk.

26.     Upon information and belief, the Enterprise structured the tax strategy so that the total

of fees to them and others was between five and one-half percent (5.5%) and nine and one-half

percent (9.5%) of the tax savings the client desired to achieve. A portion of Plaintiffs' fees,

unknowingly to Plaintiffs, were paid to Defendants.  Defendants received at least $184,000.00,

despite Plaintiffs not even knowing of their existence.

27.     The Members of the Enterprise, including Defendants and other unnamed co-

conspirators, singly and in concert, directly or indirectly, engaged in a common plan, transaction and

course of conduct described herein in connection with the tax strategy at issue, pursuant to which

they knowingly or recklessly engaged in acts, transactions, practices and a course of business which

operated as a fraud upon Plaintiffs.  Further, Members of the Enterprise made various false

7

statements of material fact to Plaintiffs, and omitted to state material facts which made their statements false or misleading.

28.   The purpose and effect of the plan of the Enterprise was to generate huge fees by co-promoting an alleged tax-savings strategy.

29.   The Members of the Enterprise, including Defendants herein, either had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with such reckless disregard for the truth that they failed to ascertain and disclose the true facts, even though such facts were available to them.  In this regard, the Members' misrepresentations and omissions included, *inter alia*:

a.    Failing to disclose to Plaintiffs the true likelihood that the tax strategies would pass IRS muster, which was slim;

b.    Failing to disclose to Plaintiffs that the Enterprise retained virtually unlimited discretion to determine whether the tax strategies would pass muster and therefore, could ensure, if they so chose, that the tax strategies would *not* pass muster;

c.    Failing to disclose the number of other participants in the tax strategy which effectively foreclosed any possibility that the tax strategy would pass muster with taxing authorities, including the IRS;

d.    Failing to apprise Plaintiffs that the tax strategies had no reasonable possibility of a profit (certainly not in excess of the fees paid), and that, in reality, the net effect of the options they were purchasing and selling was nothing more than a wager, betting on where the price of the underlying currency would be at a particular time on a specific date;

8

e.     Failing to disclose to Plaintiffs that this strategy was designed and created by the Enterprise and its Members, including Defendants herein; and

f.     Failing to disclose to Plaintiffs the identity of the Defendants and failing to disclose that the Defendants would receive a fee in the amount of at least $184,000.00 of the overall fee paid by Plaintiffs.

30.    As a result of and in reliance on these misrepresentations and omissions, Plaintiffs engaged in the strategies at issue.

31.    Had Plaintiffs known of the material adverse information which the Enterprise did not disclose, they would not have engaged in the strategies at issue.

32.    The Members of the Enterprise owed duties to the Plaintiffs. These duties included the duty to:

a.     Exercise prudence, caution and care in recommending and entering into the tax strategies for and with Plaintiffs; and

b.     Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to Plaintiffs, including apprising them of the identity of the Members of the Enterprise, including Defendants, and the fact that the Defendants were to receive a portion of the fee paid by Plaintiffs.

33.    The Members of the Enterprise intended to and did indeed deceive Plaintiffs, as evidenced by the $184,000.00 check written to Defendants, which was unknown to Plaintiffs until on or about December 6, 2006.

34.    The Enterprise chose to defraud the Plaintiffs for personal gain in the form of outrageous fees. These transactions to defraud were perpetrated through the Enterprise's discrete

9

acts of misrepresentation, including but not limited to the $184,000.00 check written to Defendants, which was unknown to Plaintiffs until on or about December 6, 2006.

**B.    THE ENTERPRISE IS FORMED AND THE SCHEME IS PUT IN ACTION**

35.    Upon information and belief, the Enterprise developed, among other things, a concept to use unnamed co-conspirator intermediaries to get to the "targets," such as Plaintiffs. This marketing approach not only capitalized on relationships the unnamed co-conspirators had with their clients, but actually envisioned that Defendants would allow the unnamed co-conspirators to front for them to increase their marketing success.

36.    The Enterprise and its Members consisted of a team of co-conspirators, including lawyers, banks, and others, along with Defendants. This Enterprise devised and implemented their well-planned sales strategy that focused on leveraging trust and confidence, coupled with pressure as needed, to sell the strategies to trusting clients.

37.    Based on information and belief, an unnamed co-conspirator law firm prepared an opinion letter opining as to the propriety of the tax strategies long before beginning to solicit clients. The opinion letter was a canned, prefabricated form that was utilized with minor changes based on the particular target, for each and every strategy sold across the country. Indeed, macros or templates of such opinion letters were actually used, requiring only that entries to certain fields be made to generate a "customized" opinion letter for each particular client.

38.    Members of the Enterprise identified potential wealthy clients and set up meetings to discuss the strategies, capitalizing on the close relationships they had with their respective clients and individual owners. They then gave an initial sales presentation. The crux of the sales pitch was

10

that a major law firm would prepare an "independent" opinion letter confirming the propriety of the strategies, which would supposedly provide insurance in the event of an audit.

39.     The chief, if not only, goal of the Enterprise was to make money, and the best interests of the "targets" were secondary at best.  Accordingly, the Enterprise and its Members, including Defendants entered into an arrangement where each would receive a certain portion of the fee for each transaction sold.

C.     THE ENTERPRISE SOLICITS THE PLAINTIFF

40.     Based on the professional weight and public reputations of the Members of the Enterprise, Plaintiffs agreed to engage in the tax strategies.

41.     Although the Plaintiffs and their owners are successful business people, they do not have knowledge about complex tax and legal matters. Thus, Plaintiffs relied on the unnamed co-conspirator Members of the Enterprise for their expertise.

42.     No one ever told Plaintiffs that the strategies were actually created and designed, and would be implemented by, the Enterprise itself. Indeed, Plaintiffs were never made aware that the Enterprise was providing a legal opinion as to the validity of a tax shelter *they created themselves*, resulting in a decidedly un-independent opinion letter.

43.     The roles of the Members of the Enterprise were not limited to providing investment advice.  To the contrary, the co-conspirators discussed most aspects of the strategies with the Plaintiffs, including the alleged tax benefits of the strategy.  For instance, some Members informed the Plaintiffs that by forming a partnership to engage in the strategies at issue, it was possible to create large capital losses for tax purposes that would largely eliminate or offset their expected substantial capital gain and income.  Members of the Enterprise informed the Plaintiffs that the

11

strategies at issue would result in either a large profit or a small loss in real dollars but that any small

"real" loss would be more than offset by the tax savings from the large capital loss generated by the

strategies at issue.

44.    Members of the Enterprise failed to advise the Plaintiffs as to certain IRS Notices

outlined below, which were likely to impact the propriety of the strategies utilized by the Enterprise

and its Members, including Defendants.

45.    Members of the Enterprise also failed to advise Plaintiffs, not only Defendants' of

role in the Enterprise and the scheme, but also of Defendants' existence itself.  Such existence was

unknown to Plaintiffs until on or about December 6, 2006, at which point Plaintiffs' attorneys

discovered that Defendants had received of at least $184,000.00 of the amount paid by Plaintiffs to

the Enterprise.  Plaintiffs are still unsure of Defendants' role in the scheme.

### D.    IRS NOTICE 1999-59: TRANSACTIONS LACKING IN "ECONOMIC SUBSTANCE" ARE ILLEGAL

46.    On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance

Using Distribution of Encumbered Property." In this Notice, the IRS stated:

> The Internal Revenue Service and Treasury Department have become aware of
> certain types of transactions as described below, that are being marketed to taxpayers
> for the purpose of generating tax losses. This notice is being issued to alert taxpayers
> and their representatives that the purported losses arising from such transactions are
> not properly allowable for Federal income tax purposes. . . . Through a contrived
> series of steps, taxpayers claimed tax losses for capital outlays that they have in fact
> recovered. Such artificial losses are not allowable for Federal income tax purposes.

The clear message from the IRS to the unnamed co-conspirators and Defendants was that purported

losses arising from transactions wholly lacking in "economic substance" are not properly allowable

for Federal income tax purposes. Members of the Enterprise completely failed to discuss and analyze the effect and significance of this IRS Notice on the strategies with the Plaintiffs.

47.     As a result of Notice 1999-59, Members of the Enterprise knew or certainly should have known that the IRS would assert that the purported losses arising from the strategies were improper and not allowable for tax purposes; however, based on information and belief, Members of the Enterprise intentionally did not disclose this information to Plaintiffs and, indeed, told them the exact opposite.

E.     IRS NOTICE 2000-44: THE IRS CONTENDS THAT THE STRATEGIES ARE ILLEGAL

48.     In August 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the country that the strategies such as those described herein were illegal. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the strategies described herein in Notice 1999-59.[1]

49.     Most importantly, Notice 2000-44 specified the precise transactions marketed by the Enterprise to Plaintiffs, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] § 752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated, "The purported losses from these transactions (and from any

---

[1]     2000-44 was issued before the Enterprise issued opinion letters and before Plaintiffs had, in reliance on those letters and the other advice received from the unnamed co-conspirators, filed their tax returns

similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to the Members of the Enterprise was that the purported losses arising from these strategies are not properly allowable for Federal income tax purposes. The Enterprise, however, simply ignored the IRS and this Notice to the detriment of Plaintiffs.

50.     There is no doubt that the Enterprise knew or should have known that, as a result of IRS Notices 1999-59 and 2000-44, the purported losses arising from the Plaintiffs' participation in the strategies at issue were not properly allowable for Federal or State income tax purposes; however, the Members of the Enterprise intentionally failed to inform the Plaintiffs of this fact to their detriment. More importantly, the Enterprise entirely failed to retract, modify, or qualify in any way their advice to Plaintiffs, the opinions expressed in their opinion letters, or their advice in connection with the preparation of the Plaintiffs' tax returns confirming the propriety of Plaintiffs' tax returns.

51.     The Enterprise represented in its opinion letters to Plaintiffs that the strategies at issue herein were legal tax shelters despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the type of transaction Plaintiffs undertook, based on the advice and recommendation of the Enterprise, was illegal. The Enterprise simply ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 and, therefore, knowingly deceived and misled the Plaintiffs to their detriment.

52.     The Enterprise represented that these strategies were not required to be disclosed on the Plaintiffs' respective federal tax returns pursuant to Treas. Reg. 5 1.601 1-4(a). Further, the Enterprise failed to register these strategies as a tax shelter with the Internal Revenue Service

14

pursuant to Treas. Reg. 5 301.611 1-2 and did not advise the Plaintiffs that registration of such strategies was required.

53.     Unbelievably, the Enterprise actually promoted and implemented the strategies after Notice 2000-44 was issued expressly stating that these transactions were illegal and invalid. Unfortunately, the Enterprise did not disclose this important development to the Plaintiffs because the Enterprise knew that with this information, Plaintiffs would refuse to participate in the strategies and would ask for a return of their fees. Clearly, the Enterprise placed its greed over the Plaintiffs' best interests.

**F.     DEFENDANTS' REPEATED FAILURE TO GIVE FULL DISCLOSURE TO PLAINTIFF**

54.     As a result of IRS Notices 1999-59 and 2000-44, the Enterprise knew or should have known that they were illegally promoting an unregistered tax shelter by marketing the strategies at issue to the Plaintiffs, and that the purported losses arising from the strategies were not properly allowable for Federal and State income tax purposes; however, the Enterprise intentionally failed to inform the Plaintiffs of this and, in fact, advised it to the contrary. Simply stated, the Enterprise and its Members repeatedly deceived and knowingly misled the Plaintiffs and placed their greed over the best interest of Plaintiffs in order to make money.

**G.     THE OPINION LETTERS FOR THE PLAINTIFFS' 2002 TAXES**

55.     In April 2002, the Enterprise sent the individual owners of the Plaintiffs virtually identical opinion letters, regarding the propriety of the strategies at issue (the "Opinion Letters"). Plaintiffs were still under the mistaken belief that the Opinion Letters set forth "independent" opinions of a law firm on the propriety of the strategies at issue; they had no knowledge at this point in time that the Enterprise had itself devised the scheme.

56.     The Opinion Letters were authored and prepared, based in part, on representations made by the Enterprise.

57.     Tellingly, the opinion letters stated that Notice 2000-44 "does not change the existing law which we rely upon herein." Based on information and belief, the Enterprise and its Members were aware of the existence and effect of Notices 1999-59 and 2000-44 but intentionally failed to fully discuss or analyze the effect of the Notices on the strategies.

**H.      THE ENTERPRISE FAILED TO GIVE PLAINTIFFS FULL DISCLOSURE**

58.     At no time prior to or subsequent to their implementation of the strategies at issue were Plaintiffs informed that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the Enterprise was therefore illegally promoting an unregistered tax shelter by marketing the strategies to Plaintiffs. The Enterprise and its Members failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary.

59.     Between the time the Enterprise advised, recommended, and pressured Plaintiffs to enter into the strategies at issue and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the Enterprise and its Members never disclosed to Plaintiffs the significance of IRS Notices 1999-59 and 2000-44. The Enterprise failed to advise Plaintiffs that the strategies lacked a business purpose and economic substance and, in fact, advised Plaintiffs to the contrary. Based on information and belief, the Enterprise and its Members intentionally failed to disclose this material information to the Plaintiffs.

60.     As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Enterprise and its Members knew or should have known, before issuing the Opinion Letters, and before preparation of Plaintiffs' tax returns, that

the IRS would contend that the purported losses arising from the strategies were not properly allowable for Federal or State income tax purposes. However, the Enterprise and its Members intentionally failed to inform Plaintiffs of this and, in fact, informed them to the contrary.

61.     The Enterprise and its Members failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the strategies at issue.

I.     THE CONSPIRACY AMONG THE MEMBERS OF THE ENTERPRISE

62.     Upon information and belief, the Members of the Enterprise conspired to devise and promote the strategies at issue for the purpose of receiving and splitting millions of dollars in fees (the "Members' Arrangement"). The receipt of those fees was the primary, if not sole, motive in the development and execution of the transaction. Further, the amount of fees charged by the Members of the Enterprise was not tied to or reflective of the amount of time and effort they expended in providing tax, accounting or other services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns.

63.     Some Members received a portion of the fee charged to clients despite performing no work on those clients' behalf, merely because they were a Member of the Enterprise and part of the conspiracy.

64.     The Members of the Enterprise devised the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the strategies at issue by agreeing to the representations that would be made and issuing the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned template opinions used for each and every client across the United States with the later insertion of client-specific basic factual information.

65.     The Members of the Enterprise aggressively put their scheme into action.  All Members of the Enterprise solicited their own clients to enter into the strategies at issue.  One of the unnamed co-conspirators identified the Plaintiffs as potential clients based on his knowledge of the Plaintiffs' finances. The Plaintiffs became targets.

66.     The receipt of fees and pecuniary gain from those fees was the primary motive for the Members of the Enterprise's conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Members' conduct alleged herein. Further, the Members' Arrangement gave each of the participating Members a significant pecuniary interest in the advice and professional services they and other Members of the Enterprise would render.

67.     The Members of the Enterprise had a financial, business and property interest in inducing Plaintiffs, as well as other clients, to enter into the strategies at issue, and to do so, promised, opined and assured that the transactions would enable the Plaintiffs to have a reasonable opportunity to make a profit and at the same time legally reduce their taxes.

68.     Based on information and belief, each Member of the Enterprise entered into the Members' Arrangement, whereby they agreed they would solicit clients to participate in the strategies and share the fees.

69.     Based on information and belief, pursuant to the Members' Arrangement, the Members of the Enterprise split the fee that was charged clients that participated in the strategies at issue, including the Plaintiffs.

## J.     MORE RECENT PRONOUNCEMENTS OF THE     IRS REGARDING THE TAX STRATEGIES

70.      In June of 2003, the IRS formalized its position regarding the strategies at issue and other 2000-44 transactions by issuing new regulations (the "Regulations") retroactive to October 18, 1999, and through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). The Regulations invalidated the strategies and the OCC Notice explained the IRS's reasoning why the strategies are invalid. The description of the transaction makes it clear that the tax strategies implemented by the Enterprise on behalf of the Plaintiffs were included.

71.      The Regulations, retroactive to before the date of the implementation of Plaintiffs' transactions, totally invalidated the strategies implemented by the Enterprise on behalf of Plaintiffs.

72.      In the OCC Notice, the IRS also indicated that it would not be relying only upon the Regulations to invalidate the Plaintiffs' transactions, but would also be taking the position that the losses generated by such transactions may be disallowed under §§ 165(c)(2) and 465(c)(4) of the Code, which was completely at odds with what the Plaintiffs' were told by the Members of the Enterprise about the tax strategy that they were placed in.

73.      Finally, the IRS also took the position in the OCC Notice, again contrary to what the Plaintiffs were told in the opinion letters provided by the Enterprise, that the transaction may be set aside as violative of the partnership "anti-abuse" rules.

74.      In sum, the IRS took multiple positions in the OCC Notice, any one of which thoroughly invalidated the strategies at issue and caused disallowance of all losses created thereby.

75.      On or about May 5, 2004, in Notice 2004-46, the IRS, in furtherance of its previous pronouncements, offered to "settle" with the Plaintiffs and other like-situated taxpayers if those parties paid to the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other "out of pocket" costs deducted. If

Plaintiffs did not accept this offer, then the IRS indicated they would be assessed all tax and interest, lose all deductions, and be assessed a 40% penalty.

### K.   THE COST OF THE STRATEGIES

76.   The Plaintiffs lost a significant amount of money in carrying out the strategies at issue. For the strategies and tax returns in connection therewith, the Plaintiffs paid fees to the Enterprise of at least $995,000.00, at least $184,000.00 of which was paid to Defendants.

77.   The Plaintiffs also incurred and are continuing to incur significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them.

## IV.

## FIRST CAUSE OF ACTION

## CIVIL VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

78.   Plaintiffs adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

79.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c).

80.   At all times relevant hereto, each of the Plaintiffs and Members of the Enterprise were "persons" within the meaning of 18 U.S.C. §1961(3).

### The RICO Enterprise

81.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

20

82.    The enterprise at issue in this case, for purposes of 18 U.S.C. §§1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d), is an association-in-fact of all unnamed co-conspirators and Defendants - "Members of the Enterprise" - collectively referred to herein as "the Enterprise." The wrongdoers that were part of the association-in-fact Enterprise include Defendants, banking institutions, law firms that issued the opinions, accountants that reviewed the strategies and accountants that drafted the Plaintiffs' applicable tax returns, as well as those employees and agents of Members of the Enterprise and other non-defendant entities that participated in the fraudulent representations to Plaintiffs, the public, the courts, and various regulatory and enforcement agencies. In fact, at times throughout the years the Enterprise conducted these schemes, the number of Members conspiring and colluding in the Enterprise fluctuated because the Enterprise would newly solicit some additional co-conspirators and discharge others, in order to increase profitability.

83.    While Defendants participated in the Enterprise and were a part of it, Defendants also have an existence separate and distinct from the Enterprise.

84.    Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

85.    Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

86.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

87.    Defendants and all other Members of the Enterprise shared fees, costs, information, resources, and the fruits of its predicate acts. The association-in-fact Enterprise, Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a

continuing unit, pursuing a course of conduct as set forth above (*i.e.,* the pursuit of customer prospects, the promotion and the sale of the series of tax strategies and, importantly, the sharing of fees), with a common or shared purpose (*i.e.,* to convince potential clients to allow it to attempt to eliminate those clients' tax liabilities, all the while charging exorbitant fees for the shared benefit of the Members of the Enterprise) and continuity of structure and personnel (including partners, associates and support staff).

88.     Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a) and (b), and have conspired to violate §1962(c) in violation of §1962(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting and/or selling and inducing the purchase of transactions which were designed to reduce or eliminate tax liability and which have been, or will be, determined by the IRS to be illegal and/or abusive tax shelters under IRS Notice 2000-44, IRS Announcement 2004-46, and/or other IRS Notices or Announcements, and by collecting exorbitant fees therefor.

89.     Defendants have violated 18 U.S.C. §1962(d), inasmuch as they knowingly, intentionally, and unlawfully, aided and abetted each other and the Enterprise and conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

### The Scheme

90.     As set forth hereinabove, for a substantial period of time, the Members of the Enterprise knowingly, intentionally and directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in the pursuit of and solicitation of and

eventual inducement of clients to participate in tax strategies which were purportedly designed to reduce or eliminate tax liability for their clients by means of false or fraudulent representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme and received exorbitant fees therefor, which were split amongst the Members regardless of their participation in any one transaction.

91.     In furtherance of their scheme, the Members of the Enterprise failed to reveal to the Plaintiffs the number of other participants that were pursued and solicited by the Enterprise for placement into, and that actually were induced to participate in, these same or similar tax strategies which the Enterprise knew, should have known, and was in the best position to know would not withstand the challenge and/or scrutiny of the IRS.  This was not a single scheme intended to induce one sole victim to do anything; the Members of the Enterprise schemed to pursue and solicit several hundred, if not more than a thousand, victims, as evidenced by the July 1, 2004 IRS announcement of a turnout of more that 1,500 taxpayers electing to settle with the IRS for participating in potentially illegal or abusive tax shelters, many of whom were participants in the scheme described herein.

92.     The particulars of the scheme concocted by the Enterprise in order to reduce or eliminate tax liability by means of false or fraudulent representations or promises in the instant case consist of the following:

a.     In or around October of 2001, Plaintiffs were approached in New Orleans by unnamed co-conspirator John B. Ohle, III ("Ohle"), who proposed that the Enterprise offered new and unique products or strategies which could reduce or eliminate certain of the Plaintiffs' 2001 tax liabilities.

23

b.    Plaintiffs' decision to engage the Enterprise was based on the advice, representations and recommendations of unnamed co-conspirator Ohle and other Members of the Enterprise during the initial presentation and thereafter.

c.    As a result of their interaction with unnamed co-conspirator Ohle and the Enterprise, Plaintiffs entered into a series of transactions which were orchestrated by the Enterprise with limited foreknowledge or input from Plaintiffs other than signatures giving authority to the Enterprise to act in furtherance of its promises.

d.    Other Members of the Enterprise were directed by the Enterprise to perform acts in furtherance of the scheme.  Some examples include: 1) an October 29, 2001 fax from unnamed co-conspirator Scott D. Deichmann, copied to unnamed co-conspirator Ohle, asking an unnamed co-conspirator law firm to send confidentiality agreements to their client Plaintiff David Ducote; 2) an October 30, 2001 fax from an unnamed co-conspirator law firm to Plaintiff David Ducote stating "at the request of John Ohle of Bank One, attached is a nondisclosure agreement for your execution;" 3) a November 9, 2001 fax from an unnamed co-conspirator bank to Susan Burnside of the unnamed co-conspirator law firm, asking that unnamed co-conspirator Jeffrey Conrad be notified when the [Plaintiffs'] documents are ready to be picked up so that he can deliver them [to the Plaintiffs]; 4) a November 15, 2001 fax from the unnamed co-conspirator law firm to David Ducote stating "at the request of John Ohle of Bank One, attached is a nondisclosure agreement for your execution;" 5) a November 21, 2001 letter from the unnamed co-conspirator law firm to Plaintiffs' accountant stating "[p]ursuant to the request of Bank One" and requesting that the

24

Plaintiffs execute various documents; and 6) an oral directive from an unknown co-conspirator to unnamed co-conspirator Bradley to write a check in the amount of $184,000.00 to Defendants;

e.      The more clients that the Members of the Enterprise pursued, solicited and eventually induced to participate in the scheme, the more money the Enterprise would earn. Other Members of the Enterprise, including Defendants, were paid from the fees paid by Plaintiffs to the Enterprise, in many cases without the knowledge of Plaintiffs, in furtherance of the Enterprise.   During discovery in a related case, Plaintiffs discovered that Defendants had been paid at least $184,000.00 by Plaintiffs, an amount that Plaintiffs would not have had to pay if Defendants had not been involved in the Enterprise.   This payment, not to mention the identity of Defendants themselves, was never disclosed to Plaintiffs.

f.      Prior to and during all transactions relative hereto, the Enterprise represented to Plaintiffs that these tax strategies were new and unique and as such, not substantially similar to transactions that had been deemed abusive by the IRS in official notices and announcements.   In fact, the Enterprise knew or should have known that the tax strategies they were marketing and promoting were substantially similar to prior strategies found abusive by the IRS, and, as such, would be intensely scrutinized by the federal and state tax authorities.

g.      The fees paid by the Plaintiffs enabled the Enterprise to pursue, solicit and induce other individuals and entities to participate in the tax strategies at issue.   The fees were reinvested into the Enterprise in order to fund the Enterprise, using or investing,

directly or indirectly, part of the income, or the proceeds of such income, gained from the pattern of racketeering activity alleged herein, back into the Enterprise in order to be able to pursue additional clients and induce them to participate in the scheme set forth herein.   Members of the Enterprise invested the money back into the Enterprise in order to provide the funding to market their tax strategies to other high net-worth individuals and/or business entities, which also caused the injury to Plaintiffs because the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold compromised the viability of all of the transactions globally.   Thus, although the Members of the Enterprise knew or should have known that the tax scheme they promoted would be deemed illegal and/or abusive, the sheer volume of transactions solicited by those Members foreclosed any possibility that the tax authorities would find in favor of Plaintiffs.

h.      Defendants and other Members of the Enterprise failed to disclose that there were hundreds of other participants to whom they had sold similar or identical tax strategy products to those sold to the Plaintiffs; hundreds of participants that were involved in the same or substantially similar tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise.

i.      The Enterprise deliberately misled Plaintiffs into believing that the number of other participants was extremely limited, and as such, that the proprietary nature of the transactions would not be compromised.

j.  While soliciting Plaintiffs, but before the Enterprise delivered an actual tax opinion, unnamed co-conspirator and Member of the Enterprise Ohle expressly and repeatedly represented to Plaintiffs on the telephone that:

    i.  the tax strategy was highly defensible;

    ii.  if the tax strategy ever came to the attention of the IRS, at worst, the IRS would settle at a substantial discount of the tax liability otherwise due; and

    iii.  due to the underlying defensibility of the strategy and the litigation risk to the IRS, the Plaintiffs would not have to pay interest or penalties.

k.  On April 8, 2002, months after the Enterprise had pursued and solicited Plaintiffs, and months after Plaintiffs had paid the exorbitant fees to the Enterprise, Plaintiffs received a legal opinion, backdated to January 9, 2002, and other information necessary to complete tax returns with respect to the transactions at issue.  The opinions Plaintiffs received stated in pertinent part: "we are of the opinion that the described tax consequences have substantial authority and that it is more likely than not that you should prevail if challenged by the IRS."

l.  On May 20, 2004, Plaintiffs were notified that the transactions they had entered into *were* or would be determined to be potentially abusive pursuant to IRS Notice 2000-44, and were further notified that the deadline for disclosure and for entering into preliminary settlement discussions with the IRS, pursuant to IRS Announcement 2004-46, was June 21, 2004.

m.  Plaintiffs were denied the opportunity to make a well-reasoned business decision regarding the risks involved in engaging in the schemes concocted by the Enterprise,

due to various misrepresentations and failures to disclose made by the Enterprise. In particular, Members of the Enterprise made oral representations, both telephonically and in person, to representatives of the Plaintiffs about the defensibility and validity of the underlying tax strategies as set forth above. Moreover, the Enterprise failed to notify the Plaintiffs that there were many, perhaps several hundred or even more than a thousand, other individuals and/or business entities that were pursued, solicited, and induced to participate in the underlying tax strategies. Plaintiffs were not even provided with the tax legal opinions until long after payment to the Enterprise for those opinions was made.

n.     The importance of the failure to tell Plaintiffs about the others involved in the scheme is that the collective number of the strategies and/or transactions that the Enterprise designed, created, engineered, implemented, marketed, promoted and/or sold compromised the viability of all of the transactions globally. Although the Enterprise knew or should have known that the tax scheme it promoted would be deemed illegal and/or abusive, the sheer volume of transactions sold by the Enterprise foreclosed any possibility that the tax authorities would find in favor of the Plaintiffs.

93.    The Enterprise never fully disclosed the risks or clearly articulated the nature of the transactions to Plaintiffs and, in fact, completely misrepresented the worst case scenario to the Plaintiffs. Moreover, the Enterprise failed to even provide the tax legal opinions until *after* Plaintiffs paid over a million dollars in fees for those opinions, at least $184,000.00 of which Plaintiffs would not have had to pay but for the Defendants' involvement in the scheme.

28

**Predicate Acts**

94.     With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiffs, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and other Members of the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs. The predicate acts were acts of deception which furthered the goal of soliciting clients to participate in what the Enterprise knew or should have known was fraudulent and would be deemed abusive by the IRS. Specifically, the Enterprise knew that certain of its strategies *had been* deemed abusive by the IRS and that "new" strategies that they were promoting were not different enough to survive inspection or investigation by the IRS. Moreover, the Enterprise knew that it was placing several hundred, perhaps over a thousand, individuals and/or business enterprises in these strategies, likely foreclosing any possibility that the tax authorities would find in favor of their clients.

95.     With respect to the activities alleged herein, the Enterprise sought to aid and abet and actually did aid and abet a transaction to violate 18 U.S.C. §§1962(a), (b) and (c). Each Member of the Enterprise, including Defendants, agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and actually obtaining fees to which Defendants and other Members of the Enterprise were not entitled.

96.     With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other co-conspirator entity or to violate 18 U.S.C. §§1962(a), (b) and (c), all in violation of 18 U.S.C. §1962(d). In violation of §1962(c), each Member of the Enterprise agreed and conspired with each other Member, to: a) pursuant to §1962(a), invest fees paid by Plaintiffs into pursuing and soliciting other clients, inducing and causing other individuals and

29